JOHN R. SHEPLEY, *et al.*, Trustees under will of Wm. M. Mc-Pherson, Respondents, *vs.* JOHN EPES COWAN, *et al.*, Appellants.

52 559
161 618

1. *Land and land titles—Acts of Congress of June 13th, 1812, and May 26th 1824, granting commons to the villages of St. Louis and Carondelet—Reservation of commons—Decision in case of Carondelet vs. St. Louis, (1 Black., 179.)* Under the acts of Congress of June 13th, 1812, and May 26th, 1824, the city of Carondelet claimed certain lands as commons, and it became the duty of the President of the United States to reserve said lands from entry or sale; and said lands were thus reserved from entry or sale from the passage of said act of June 13th, 1812, till the decision of the United States Supreme Court in the case of Carondelet vs. St. Louis, decided at December Term 1861, of that court. Proper entries of such reservation were made at the local land office of St. Louis which give due notice to all persons, thereof. It is thus established that said lands were reserved from entry or sale down to the said December Term 1861, of the United States Supreme Court.

2. *Land and land titles—Act of Congress of September 4th, 1841—Act of the General Assembly of Missouri accepting grant—Selection of land under said acts—Reservation.*—Under section 8 of an act of Congress approved September 4th, 1841, entitled " an act to appropriate the proceeds of the sales of the public lands, and to grant pre-emption rights," it was provided that there should be granted to certain States, Missouri among the number, five hundred thousand acres of land for purposes of internal improvements, ' and provided that the selection of such land should be made from any public land, except such as was or might be reserved from sale by any law of Congress or proclamation of the President of the United States. The General Assembly of Missouri passed certain acts accepting the five hundred thousand acres of land and providing for its selection. In 1849 the Governor of Missouri selected for plaintiff a part of the land which under the act of Congress of June 13th, 1812 had been reserved from entry or sale, and which was so reserved until December, 1861. *Held,* that said land being so reserved from entry or sale at the date of such selection was not of the character intended to be granted in the 8th section of the act of Congress of September 4th, 1841 and was not embraced in that section, and therefore such selection was null and void and no title could pass thereby to the State of Missouri, and the State could therefore pass none to the plaintiff.

3. *Land and land titles—Statute, construction of—Granting words.*—A statute which provides that " there shall be granted, " etc., does not have the effect of making a grant. No title passes by the force of the act itself, the words imply that some other act is to be passed, before the Government parts with the fee to lands which it is provided shall be granted.

4. *Land and land titles—Lists certified by the Commissioner of the General Land Office—Land reserved—Act of Congress of Aug. 3rd, 1854.*—The act of Congress of Aug. 3rd, 1854, provided that "in all cases where lands have been or shall be hereafter granted by any law of Congress to any one of the several

States or Territories, and when said law does not convey the fee simple title of such lands or require patents to be issued therefor, the lists of such lands which have been certified by the Commissioner of the General Land Office under the seal of said office, shall be regarded as conveying the fee simple of all the lands embraced in said lists that are of the character contemplated by such acts of Congress, and intended to be granted thereby ; but where lands embraced in such lists are not of the character embraced by such acts of Congress and are not intended to be granted thereby, said lists, so far as these lands are concerned, shall be null and void" etc. Under these provisions of said act, the Commissioner of the General Land Office issued under the seal of his office a certificate that the State had selected under the 8th section of the act of Congress of September 4th, 1841, certain land, which was reserved from entry or sale under the act of June 13th 1812, and was reserved from entry or sale at the time the certificate was dated, and which had been selected by the State of Missouri under the law of September 4th 1841, which excluded from such selection land which had been reserved from entry or sale. *Held*, that such certificate of the commissioner was null and void and conveyed no title.

5. *Limitation, statute of—Not only bars but transfers titles—Does not run against the Government.*—The statute of limitations is a statute of repose. It not only bars, but may transfer a title. The statute does not run against the Government.

### *Appeal from St. Louis Circuit Court*

*Britton A. Hill*, for Appellants.

I. The State location by McPherson as agent for the State is void, for the following reasons : ·

(*a.*) It is not on land subject to sale or entry. The land was not public land in 1850, but was. reserved from sale, entry or location, being a part of the commons of Carondelet, a Spanish village having commons and common fields, adjoining on the south the common fields of St. Louis, another Spanish village, now the city of St. Louis.

(*b.*) The grant was complete for these commons to Carondelet north of the village on the 13th of June, 1812, and vested the title in Carondelet. This is admitted in the record of the case of Carondelet vs. St. Louis, a part of this record. (Carondelet vs. St. Louis, 1 Black., 179 ; Bird vs. Montgomery, 6 Mo., 511 ; Chouteau vs. Eckhart, 2 How., 421, 450 ; Guitard vs. Stoddard, 16 How., 494 ; West vs. Cochran, 17 How., 416, 417 ; Carondelet vs. St. Louis, 25 Mo., 448 ; Milburn vs. Hortez, 23 Mo., 532 ; Same case, 1 Black, 595.)

II. It is therefore established by authority that these commons of Carondelet were not public land—were not subject to sale, entry, location, or pre-emption prior to 1862. (Kissell vs. The Schools, 18 How., 25.)

The State location of 1850 is therefore void, a nullity *ab initio*.

III. The act of 3rd of March, 1853, (vol. 10, U. S. Stat., p. 244,) gave the Chartrands the right to pre-empt this fractional section 9, if they were *settlers* before or after the date of that act, as soon as the Supreme Court of the United States declared the claim of Carondelet to the same land, as commons, invalid. They were *settlers* and cultivators both before and after the date of that act of Congress.

The Chartrand pre-emption and patent vested the title of the United States in the heirs of Thomas Chartrand on the 21st day of July, 1866, and no criticism of the validity of the pre-emption can be made by McPherson, who came in during the years 1848 or 1850, claiming adversely.

IV. The State location of McPherson in 1850 was invalid as against Chartrand's pre-emption, for the further reason that the act of Sept. 4, 1841 (5 U. S. Stat. 455), did not convey the fee to any lands whatever, but left the land system of the United States in full operation as to regulation of titles, so as to prevent conflicting entries. When the State of Missouri issued a patent to McPherson, the State had no title. (Foley *et al.* vs. Harrison, 15 How., 443–5, 450 (1853) ; Wilcox vs. Jackson, 13 Pet., 498 ; Bagnell vs. Broderick, 13 Pet., 436 ; The Pacific Railroad vs. Lindell Heirs, 39 Mo., 330 ; Hannibal & St. Joseph Railroad vs. Moore, 37 Mo., 338.)

V. The act of Congress passed August 3rd, 1854 does not help the plaintiff, for this land was not subject to location, entry or pre-emption in 1841, 1850, or 1854. The plaintiff, therefore, stands before the court without any title whatever from the United States or from the State of Missouri. (Foley vs. Harrison, 15 How., 443–4 to 451.)

VI. Plaintiff had no claim under the statute of limitations. The pre-emption and patent both took effect in 1866, and

from that time only can the limitations begin to run. This is the express doctrine held in the case of Gibson vs. Chouteau (13 Wallace.) Prior to the patent of 21st July, 1866, the title to this land was in the United States, and on that day, for the first time, the title vested in the heirs of Thomas Chartrand. (Lythe vs. Arkansas, 9 How., 314; Foley vs. Harrison, 15 How., 433; Barnard vs. Ashley, 18 How., 43.)

VII. The plaintiff asks the court to remove the defendants' title as a cloud upon his title. But the plaintiff has no title and never had any, and defendants' title is perfect under a possession commenced fifteen years before plaintiff's illegal State location was made. There is no equity in this bill to warrant the exercise of this jurisdiction. These two claimants are adverse, and the title of defendants is perfect, and no trust for plaintiff, or wrongful act of defendants, has been shown. No privities, confidence or relations of amity have been shown between these parties. Each claims, independently of the other, an adversary title; in such a case there is no cloud to be removed, but the question, in whatever·form the action may be, is, which is the better title?

The merits of the title must be first examined. If plaintiff has no title, and defendant has it, there is no cloud to be removed, but an actual title to be examined and its effect to be determined. The universal practice has been to try the legal title at law in such cases as this. (Stoddard vs. Chambers, 2 Mo., 284; Stoddard vs. Mills, 8 How., 345; Bissell vs. Penrose, 8 How., 317; Barry vs. Gamble, 3 How., 32.)

The plaintiff having a complete defense and remedy at law, if he have any title in the suits brought by defendants in ejectment against him for this land, has no right to file a bill in equity to test the question as to who has the better legal title. See the following cases in ejectment: (Ballance vs. Forsyth, 13 How., 18; Bryan vs. Forsyth, 19 How., 434; Ballance vs. Forsyth, *Id*. 183 (in equity); Gregg vs. Forsyth, Ejectment; Kellogg vs. Forsyth, *Id*.; Dredge vs. Forsyth, *Id*. ; Gregg vs. Tesson, 1 Black., 150; Kellogg vs. Forsyth, 2 Black., 571.)

*Whittelsey*, for Appellants.

I. There is no equity in complainant's bill, to entitle him to the relief he seeks.

(*a.*) The plaintiff alleges himself to be in possession of the premises, holding under a complete legal title from the United States, to-wit: an entry and selection by the State of Missouri under the Act of Sept. 4th, 1841, properly certified by the Land Department, and a patent from the State. He holds, therefore, an apparently perfect legal title, older than defendant's patent issued in 1866.

Being in possession, he could have waited until sued in ejectment by defendants; or if defendants delayed suit, he could under the statute, have asked that defendants be required to bring suit in ejectment or show cause against it. (2 W. S., 1022, §§ 53, 54; Von Phul vs. Penn, 31 Mo., 333; Rutherford vs. Ullman, 42 Mo., 216.)

That was the only remedy to which he was entitled, upon the facts stated in his petition. Having the younger patent, the defendants could only recover against plaintiff's possession and older title, by showing an equity which antedated the plaintiff's patent. (Polk's Lessee vs. Wendall, 5 Wheat., 293 ; Ross vs. Borland, 1 Pet., 656 ; Minnesota vs. Batchelder, 1 Wall., 109.)

(*b*). The bill shows no equity as a bill of peace, for it does not show that the matter of title has ever been tried at law, nor that the plaintiff has been harrassed by repeated actions, nor that it will avoid multiplicity of suits. (McCamant vs. Patterson, 28 Mo., 410; Marmaduke vs. Han. & St. Jo. R. R., 39 Mo., 545 ; 2 Sto. Eq., §§ 587, 589.)

(*c.*) It cannot be maintained on the ground of removing a cloud upon plaintiff's title.

A bill to remove a cloud cannot be maintained, where the title asserted to be a cloud, is adverse of itself ; but only when the plaintiff's title is affected by some wrongful act, which may from failure of evidence in the future to show its illegality, becloud it. A positive adverse title is not a cloud, unless it be affected with some trust in favor of the title asserted by complainant. A reservation in a patent of all adverse rights,

does not create a trust, so as to be a cloud upon an elder legal title, although the older might be a cloud upon the young patent. (2 Sto. Eq., §§ 700–708; Ward vs. Chamberlain, 2 Black., 430; Chipman vs. Hartford, 21 Conn., 488; Lockwood vs. St. Louis, 28 Mo., 20; Drake vs. Jones, 27 Mo., 428.)

The younger patent cannot be-cloud the title under the elder patent. (Ballance vs. Forsyth, 13 How., 18; S. C., 24 How., 183; Dredge vs. Forsyth, 2 Black., 563, 570; Bryan vs. Forsyth, 19 How., 334; Gregg vs. Forsyth, 24 How., 179; Gregg vs. Tesson, 1 Black., 150; Mehan vs. Forsyth, 24 How., 178; Maguire vs. Tyler, 40 Mo., 406, 439, 440.)

II. The complainant himself has no standing in court, for he presents a title which has no validity under the acts of Congress, as the selection was not authorized by law.

This will be evident from an examination of the statutes.

The act of Sept. 4, 1841, 5 Stat., L. & B's Ed., p. 455, § 8, provides for the selections to be made in the manner the State shall direct, to be "located in parcels conformably to sectional divisions and subdivisions of not less than three hundred and twenty acres in any one location, on any public land except such as is or may be reserved from sale by any law of the Congress, or proclamation of the President of the United States, which said locations may be made at any time after the lands of the United States shall have been surveyed according to existing laws," &c.

This statute did not pass the fee from the United States. By statute, Aug. 3, 1854, c. 201; 10 Stat., 346, it was provided, "that the list certified by the Commissioner, should pass the fee of all the lands embraced in such lists, that are of the character contemplated by such act of Congress, and intended to be granted thereby; but where lands embraced in such lists, are not of the character embraced by such act of Congress, and are not intended to be granted thereby, said lists, so far as these lands are concerned, shall be perfectly null and void, and no right, title, claim or interest shall be conveyed thereby."

But this land had been originally included in the survey of

the claim of Carondelet, by Rector, and the land was reserved from sale until that claim was finally decided, under the laws of the United States, by the Supreme Court, which was in January, 1862,—10 Stat., 244, ch., 143 ;—and until that claim was decided, the defendants had the right to complete their pre-emption, if their right originated before the selection of this land, by complainant, for the State.

*T. G. C. Davis Esq.*, of counsel for Appellant Cowan, filed a brief discussing points involved in the case, which however, were not touched upon by the Court in its opinion, and the brief is therefore necessarily omitted.

*Glover & Shepley*, for Respondents.

I. That the Court of equity possesses the jurisdiction is unquestionable. "Where several parties set up conflicting claims to property with which a special tribunal may deal, as between one party and the government, regardless of the rights of others, the latter may come into the ordinary courts to litigate the conflicting claims." (Garland vs. Wynn, 20 How., 6 ; Comegys vs. Vasse, 1 Peters, 212 ; Lytle vs. Arkansas, 22 How., 202 ; Harkness vs. Underhill, 1 Black 316.) In case of disputed entries of land, equity has jurisdiction to set aside and correct any errors committed by the land officers. (Lindsay vs. Hawes, 2 Black, 554, 558.)

A court of equity will correct errors of law and fact in such cases. (Minnesota vs. Bachelder, 1 Wall., 109 ; Silver vs. Ladd, 7 Wall., 219 ; Johnson vs. Towsley, 13 Wall., 72.)

" The general rule is that when several parties set up conflicting claims to property with which a special tribunal may deal as between one party and the government regardless of the rights of others, the latter may come into the ordinary courts and litigate the conflicting claims." (Garland vs. Wynn, 20 How., 8.) In this case it is true, one party claims an equitable right only, but the court lays no stress on that. In Barnard Heirs vs. Ashley, 18 How., p. 43, there were two patents before the Court. The relief prayed was to cancel the defendant's patent. The defendant made his answer a

cross-bill, and prayed to cancel the plaintiff's patent. The court proceeded to hear the cause and maintained the jurisdiction. The Court fully considered both titles and passed on their respective merits and settled all controversy. If the principle contended for by the defendant is correct, the Barnard bill would have been dismissed for want of jurisdiction.

In Lindsey vs. Hawes, 2 Black, 554, the bill was filed by one having an equity only against the patentee. On page 558 the court say the quotation from Garland vs. Wynn, above, is the clearest statement of the rule of jurisdiction.

II. There is another ground of equity in the plaintiff's bill, independent of the power to correct errors of the land officers. We mean the jurisdiction to remove a cloud from the title of one in possession. (Lyon vs. Hunt, 11 Ala., 307; Burt vs. Cassety, 12 Ala., 740; Ward vs. Ward, 2 Haywood, 226; Leigh vs. Everheart, 4 Monroe, 380, p. 1; Hamilton vs. Cummings, 1 Johns..Ch., 517; Apthorp vs. Comstock, 2 Paige, 482; Grover vs. Hugel, 3 Russ. Ch., 432; Hayward vs. Dimsdale, 17 Vessey, 111; Williams vs. Flight, 5 Beavan, 41; Ryan vs McMath, 3 Brown Ch., 14; Jones vs. Perry, 10 Yerger, 83.)

III. The lapse of time while the plaintiff has been in possession has extinguished all claims under the alleged pre-emption right. It is said, in answer to this, that the Supreme Court of the United States held in Magwire vs. Tyler, 8 Wall. 650, that Magwire had no right to sue till his land was surveyed and patented; no limitation would run. That is true, no one can be affected by an act of limitation till he can sue. But from the moment a pre-emption exists, the pre-emptor can sue (1 R. S., 1835, p. 134; 9 Mo., 794; 11 Mo., 585,) and from that moment limitation begins to run. One who has complied with the pre-emption law has a right of action; a right of possession is vested as soon as the facts exist.

Though the claim of the defendants has been extinguished, the facts exist *in pais*, and the patent seems to be a title in Chartrand's heirs, and remains a cloud on the plaintiff's title.

IV. M'Pherson's title to the land is as follows:

"An act of Congress to appropriate the proceeds of the sales of the public lands, and to grant pre-emption rights," was passed September 4, 1841. (5 U. S. Statutes at Large, p. 453.) Section 8 of this act granted 500,000 acres to the State of Missouri, to be selected as the Legislature should direct. The General Assembly of Missouri passed acts accepting said 500-000 acres and providing for its selection. (See said acts, approved March 27, 1843, p. 77; February 2, 1847, p. 88; March 13, 1849, p. 63; March 10, 1849, p. 61–65.) Surplus may be relinquished. December 15, 1849, the Governor of Missouri selected, for the plaintiff, fractional section 9, township 44, range 7, that being the land in dispute, and relinquished the surplus of 320 acres over 37 40-100 acres, the area of said fractional section 9. The plat of the United States survey of the tract was on file in the office of the register of lands in April, 1841. The selection of the tract by the Governor was approved by the Secretary of the Interior of the United States, January 17, 1850, and the land was patented to McPherson by the State of Missouri, February 27, 1850. This McPherson title is sixteen years older than the patent under which the defendants claim. The legal presumption favors this older title, and the burden of proof is on defendants to show that they have an equity, by virtue of the pre-emption laws, older than the plaintiff's patent; and there is no such equity.

Adams, Judge, delivered the opinion of the court.

This was an action in the nature of a bill in equity commenced by William M. McPherson in April, 1870, and after his death revived in the names of his executors and trustees under his will.

The plaintiff claimed that he was the legal owner in fee of fractional Section 9, in Township 44, of Range 7 East, in the District of Lands subject to sale at St. Louis, Mo., which fractional section of land contained 37 40–100 acres.

The object of this action was to correct errors in law and fact by the officers of Land Office Department of the United States Government, in allowing the heirs at law of Thomas

Chartrand Sr., deceased, to enter the land in dispute under the pre-emption laws, and to vest title in plaintiff.

This fractional section of land is situated between Caronde-let and St. Louis, and under the Acts of Congress, of 13th of June, 1812, and the 26th of May, 1824, granting commons to the then villages of St. Louis, Carondelet, etc., Carondelet claimed this piece of land as a part of its commons, and under these acts it became the duty of the President of the United States, in the execution of the laws thereof, to cause the commons as claimed to be reserved from entry or sale.

The facts and proofs in this case, show that the Carondelet commons, including the land in dispute as part thereof, were thus reserved from entry or sale from the time of the passage of the Act of Congress, of the 13th of June, 1812, down to the decision of the Supreme Court of the United States at December Term, 1861, in the case of Carondelet vs. St. Louis, (1 Black. 179,) when for the first time it was released from the claim of Carondelet for commons, by the decision in that case. The Land Department of the United States Government had caused proper entries on the books of that department, at the local land office in St. Louis, to be made of this reservation, and this reservation was thus proclaimed to all persons desiring to appropriate any part of these commons, including the land in dispute. So when offers were made, as they were in several instances, to locate pre-emptions of this fractional section of land, they were uniformly refused by the local land officers on account of this reservation; and the acts of the local land officers were approved by the Land Office Department at Washington City. So there can be no dispute that the land in question was reserved from sale or entry up to the December Term 1861, of the Supreme Court of the United States.

By an Act of Congress entitled, "An Act to extend pre-emption rights to certain lands therein mentioned," approved, March 3, 1853, it was provided: "That any settler who has or may hereafter settle on lands heretofore reserved on account of claims under French, Spanish or other grants, which have been or shall be hereafter declared by the Supreme Court of

the United States, to be invalid, shall be entitled to all the rights of pre-emption granted by this act, and the act of 4th of September, 1841, entitled, 'An Act to appropriate the proceeds of the public lands, and to grant pre-emption rights' after the lands shall have been released from reservation, in the same manner as if no reservation existed." (10 U. S. Statutes at Large, 244.)

After the decision of the Supreme Court of the United States in Carondelet vs. St. Louis, the heirs of Thomas Chartrand, Sr., deceased, were allowed by the Land Department to prosecute the claim of their ancestor as pre-emptors on this fractional section of land, and after a contest lasting for several years before the Land Department, between these heirs and the plaintiff, a pre-emption was granted to them in June 1866, and a patent issued thereon in July, 1866.

A decree was rendered at Special Term in favor of the plaintiff, which was affirmed at General Term.

The plaintiff's standing in court first demands our attention ; for, unless he has title himself, he has no right to question the claims of the heirs of Chartrand.

He assumes to stand here on a title derived from the State of Missouri, under the Act of Congress of September 4th, 1841, (5 U. S. Statutes at Large, p. 453,) entitled, "An Act to appropriate the proceeds of the sales of public lands and to grant pre-emption rights." Section 8 of this act provides, "That there shall be granted to each State specified in the first section of this act, five hundred thousand acres of land for purposes of internal improvements, &c." The State of Missouri is one of the States specified in the first section. The 8th section also points out how the lands are to be selected, and provides that the selection shall be made within the limits of the State, " on any public land except such as is, or may be reserved from sale by any law of Congress, or proclamation of the President of the United States," &c.

The General Assembly of Missouri passed acts accepting the five hundred thousand acres, and providing for its selection. (See said Acts, March 27, 1843, p. 77; February 2,

1847, p. 88 ; March 13, 1849, p. 63 ; March 10, 1849, p. 61–65.)

On December 15, 1849, the Governor of Missouri selected for plaintiff, fractional Section 9, Township 44, of Range 7, that being the land in dispute, containing 37 40-100 acres. The selection of this tract by the Governor was approved by the Secretary of the Interior of the United States, January 17th, 1850, and a patent for this fractional section was issued by the Governor of Missouri to McPherson, reciting the foregoing facts and granting the land to McPherson and his heirs, on the 27th day of February, 1850. This is the only paper title the plaintiff pretends to have for this land. It is obvious that the land in dispute, being at that time reserved from sale, was not of the character of the lands intended to be granted by the 8th section of the Act of Congress above referred to, and was not embraced in that section. That being the case, this selection in my judgment was perfectly null and void, and no title passed thereby to the State of Missouri, and the State could pass none to the plaintiff.

But independent of these considerations, the 8th section of the Act of Congress of September 4th, 1841, was not a *present* grant. It was not intended that any title should pass merely by force of the Act itself, and the selections to be made thereunder. The words are "there shall be granted" &c., and not a grant "*in presenti.*" These words import that some other Act is to be passed by Congress before the General Government parts with the fee simple title. This point was expressly decided by the Supreme Court of the United States in Foley vs. Harrison, *et al.*, 15 How., 447. Speaking of this very Act, the Court says: "It could not have been the intention of the Government to relinquish the exercise of power over the public lands that might be located by the State. The same system was to be observed in the entry of lands by the State as by individuals, except the payment of the money ; and this was necessary to give effect to the act and to prevent conflicting entries." The decisions of the Supreme Court of the United States in regard to Acts of Congress ought to be looked to by the State courts as *controlling*

authority. Whatever may be the rule in cases peculiarly cognizable by the State Courts, they must yield to that court where the subject matter in contest makes it the only court of last resort.

The case of Foley vs. Harrison was decided at the December Term, 1853. And afterwards, on the 3rd of August, 1854, Congress passed "An Act to vest in the several States and Territories the title in fee of the lands which have been or may be certified to them." It consists of a single section which reads as follows : " That in all cases where lands have been or shall hereafter be granted by any law of Congress to any one of the several States or Territories, and when said law does not convey the fee simple title of such lands or require patents to be issued therefor ; the lists of such lands which have been or may hereafter be certified by the Commissioner of the General Land Office, under the seal of said office, either as originals, or copies of the originals or records, shall be regarded as conveying the fee simple of all the lands embraced in such lists that are of the character contemplated by such Act of Congress, and intended to be granted thereby ; but where lands embraced in such lists are not of the character embraced by such Acts of Congress, and are not intended to be granted thereby, said lists so far as these lands are concerned, shall be perfectly null and void, and no right, title, claim or interest shall be conveyed thereby." (10 U. S. Statutes at Large, 346.)

This Act was no doubt intended by Congress as the means of passing the title in fee of the lands that had been selected by the several States under the Act of September 4th, 1841.

The record in this case shows that McPherson, after the passage of this Act, procured from the Commissioner of the General Land Office under his Seal of Office, the following certificate:

" General Land Office.

June 25th, 1855.

I, John Wilson, Commissioner of the General Land Office, do hereby certify that the State of Missouri selected under the

8th Section of the Act of Congress entitled, "An Act to appropriate the proceeds of the sale of the public lands, and to grant pre-emption rights," approved September 4th, 1841, fractional Section nine in Township forty-four north of Range seven, east of the fifth principal Meridian, and that said selection has been approved to said State, according to law.

<div style="margin-left:2em;">
Seal of   In testimony whereof, I have here
U. S. General unto subscribed my name and caused the
Land Office. Seal of this Office to be affixed, at the
   City of Washington, on the day and year
   above written.
</div>

John Wilson,
Commissioner of the General Land Office."

If this certificate was issued for the State of Missouri, and as a monument of its title to the land in dispute, under the Act of August 3, 1854, it must be construed in connection with that act, and the 8th section of the Act of September 4, 1841, and viewed in this light it demonstrates the nullity of the selection of the land in dispute, as that land had been reserved from sale and was not embraced in section 8, and such selection is declared by the Act of August the 3rd, 1854, to be "perfectly null and void," and that no right or title shall be conveyed thereby.

But if it be conceded that the certificate in question conveyed a title to the State of Missouri on the 25th of June, 1855, would such title pass to McPherson by virtue of his patent issued in 1850?

The Governor in issuing the patent could only do so in the execution of a statutory power, and the only title that could be conveyed was such as existed in the State at that time.

It is not a deed of conveyance purporting to convey an estate in fee simple absolute, but it recites the facts constituting the title of the State, and conveys that title and no other. An after acquired title by the State would not pass under that patent, if indeed there could be any conveyance made in any form by a sovereignty that could have the effect of passing to the grantee a title subsequently acquired.

I do not mean to be understood as intimating any opinion on this abstract question, I am however, clearly of the opinion that no after acquired title by the State could pass to McPherson under this patent, unless there be some statutory regulation to that effect, and none has been referred to, and I am not aware that any exists.

In the City of Carondelet vs. McPherson, 20 Mo., 92, it was assumed without investigation, that the title of the General Government to this fractional section of land had passed to the State of Missouri, under the act of September 4, 1841, and that the patent from the State to McPherson conveyed a complete title to him. The attention of the Court in that case was not called to the points of objection raised here, and therefore the intimation of Judge Gamble to the effect that a complete title had been conveyed to McPherson, can have no authoritative force in this contest and I merely refer to that case to show that it has not been overlooked.

There seems to be no light in which the facts of this case can be viewed so as to give the plaintiff a standing in Court.

He claims title by virtue of the statute of limitations. The statute of limitations in land contests is a statute of repose, and not only bars the title of the real owner but transfers such title to his adversary.•

And therefore if the pre-emption claimed by the heirs of Chartrand had been completed and allowed for ten years, so that they could have maintained an action of ejectment on it against McPherson, during all that time their right would have been barred, and an affirmative right thereto would have vested in the plaintiff. Such affirmative title, or right, so created by adverse possession before the issuance of the patent by the United States, ought to be a sufficient transfer of the equity to authorize a decree for the legal title after the emanation of the patent.

It would be no interference with the primary disposal of the soil by the General Government any more than in a case where the pre-emptor himself had transferred his equity before the issuance of the patent. In either case the patentee

State, ex rel. etc. v. The City of St. Louis, et al.

ought to be held as a naked trustee for the person holding the equity, whether transferred to him by contract or by the statutory bar. But there was no statutory bar in this case. The Chartrand pre-emption was not proved up or completed till June 1866. The plaintiffs' possession prior to this date could confer no title. The statute does not run against the Government; "*nullum tempus occurrit regi.*"

As these views dispose of this case, it is unnecessary to consider the other points so ably discussed by the learned counsel on both sides in making and repelling assaults on their respective positions.

The judgment must be reversed and the petition dismissed. Judge Sherwood absent, and the other Judges concur.

Since filing the foregoing opinion, the attention of the Court has been called to § 37 of Ch. 143, of the General Statutes 1865, by which an after acquired title by the State would pass to McPherson under his patent of 1850. But under the view taken by the Court the State never acquired any title whatever to the land in dispute, and therefore none passed to McPherson.

The Judgment therefore of this Court as rendered must stand. The other Judges concur.